# EXHIBIT C

# HUMAN FACTORS IN ENGINEERING AND DESIGN

**SIXTH EDITION**

## Mark S. Sanders, Ph.D.
California State University,
Northridge

## Ernest J. McCormick, Ph.D.
Professor Emeritus of Psychological Sciences
Purdue University

**McGRAW-HILL BOOK COMPANY**

New York   St. Louis   San Francisco   Auckland   Bogotá
Hamburg   London   Madrid   Mexico   Milan   Montreal   New Delhi
Panama   Paris   São Paulo   Singapore   Sydney   Tokyo   Toronto

## HUMAN FACTORS IN ENGINEERING AND DESIGN

Copyright © 1987 by McGraw-Hill, Inc. All rights reserved.
Printed in the United States of America. Except as permitted
under the United States Copyright Act of 1976, no part of this
publication may be reproduced or distributed in any form or by
any means, or stored in a data base or retrieval system, with-
out the prior written permission of the publisher.

3 4 5 6 7 8 9 0 DOCDOC 8 9 2 1 0 9 8

ISBN 0-07-044903-1

This book was set in Linotron by The Clarinda Company.
The editors were Jim Anker and John Morriss; the designer
was Carla Bauer; the production supervisor was Diane Renda.
Project Supervision was done by Chernow Editorial Services Inc.
R. R. Donnelley & Sons Company was printer and binder.

Library of Congress Cataloging-in-Publication Data

Sanders, Mark S.
  Human factors in engineering and design.

  McCormick's name appeared first on the 5th ed.
  Bibliography: p.
  Includes indexes.
  1. Human engineering.   I. McCormick, Ernest J.
(Ernest James)   II. McCormick, Ernest J. (Ernest James).
Human factors in engineering and design.   III. Title.
TA166.S33   1987        620.8'2        86-10679
ISBN 0-07-044903-1

**3** Describe the user population.

**4** Postulate all possible hazards, including estimates of probability of occurrence and seriousness of resulting harm.

**5** Delineate alternative design features or production techniques, including warnings and instructions, that can be expected to effectively mitigate or eliminate the hazards.

**6** Evaluate such alternatives relative to the expected performance standards of the product, including the following:

    **a** Other hazards that may be introduced by the alternatives

    **b** Their effect on the subsequent usefulness of the product

    **c** Their effect on the ultimate cost of the product

    **d** A comparison to similar products

**7** Decide which features to include in the final design.

## WARNINGS

Closely allied to the issue of whether a product is unreasonably dangerous are the warnings and instructions that accompany it. A distinction can be made between warnings and instructions, although it is rather fuzzy. *Warnings* inform the user of the dangers of improper use and, if possible, tell how to guard against those dangers. *Instructions* tell the user how to use the product effectively. In addition, instructions themselves may, and often do, contain warnings. We concentrate on warnings and indicate some of the human factors and legal issues involved in their use.

There are three basic approaches for making a product safer:

- Design the dangerous feature out of the product.
- Protect against the hazard by guarding or shielding.
- Provide adequate warnings and instructions for proper use and reasonable foreseeable misuse.

In general, designing the dangerous feature out of a product is the most effective means of making the product safer. Often, however, it is not possible or economically feasible to do that. In such cases guarding and shielding should be implemented where possible. Warnings should be considered after the first two design methods have been applied and where unreasonable dangers still exist.

### Purposes of Warnings

We can identify four principal purposes for warnings: (1) Inform the users or potential users of a hazard or danger, of which they may not be aware, that is inherent in the use or reasonably foreseeable misuse of the product. (2) Provide users or potential users with information regarding the likelihood and/or severity of injury from the use or reasonably foreseeable misuse of the product. (3) Inform users or potential users how to reduce the likelihood and/or severity of injury. (4) Remind users of a danger at the time and place where the danger is most likely to be encountered.

### Designing Warnings

Designing appropriate warnings is a complex task, and where the risks of serious injury or death are involved, warnings should be tested for effectiveness by using

people representative of the foreseeable user population. We cannot hope to discuss in detail all the various aspects of warning design; however, we outline the major sorts of considerations involved.

The ultimate aim of a warning is to alter behavior by encouraging the user either to not engage in a particular act or to change the manner in which the act is performed. For a warning to change behavior, the warning must be sensed (seen or heard), received (read or listened to), understood, and finally heeded. Each of these steps involve human factors design considerations.

**Sensing a Warning**   The warning must catch the attention of the consumer under the circumstances in which the product will be used. The following considerations are important: size; shape; color; graphical design; contrast; placement; use of "active" attention getters such as bells, waving flags, or blinking lights; and the physical durability of the warning itself to such things as weather and physical abuse. In addition, in Chapter 6 we discuss some design considerations for auditory warnings.

**Receiving a Warning**   Sensing the presence of a warning does not ensure that it will be read or listened to. With visual warnings, the length of the warning may influence the willingness of a user to read it. Probably, the longer and more complicated the warning, the less likely it is that people will invest the time and effort required to read it. The perceived level of hazard inferred by the warning may also influence whether it is read. The warning should, of course, be commensurate with the dangers inherent in using the product. Traditionally three levels of hazard have been differentiated:

- *Danger* is used where there is an immediate hazard which, if encountered, will result in severe personal injury or death.
- *Warning* is the signal word for hazards or unsafe practices which *could* result in severe personal injury or death.
- *Caution* is for hazards or unsafe practices which could usually result in minor personal injury, product damage, or property damage.

Presumably a person would be more likely to read a warning that started out "DANGER—THIS PRODUCT CAN KILL YOU!" than one that said "NOTE—IF THIS PRODUCT IS USED IN AN IMPROPER MANNER, IT IS POSSIBLE THAT INJURY COULD OCCUR."

The degree of familiarity with a product and its perceived hazard potential may also influence whether people read warnings (Godfrey and Laughery, 1984). Generally, the more familiar people are with a product, the more confident they are of their ability to use the product safely; and the less dangerous the product appears, the less likely it is that they will read permanently affixed warnings. There is some evidence, however, that people will read a temporarily posted warning that informs them of the development of a hazard in a familiar product or situation (Godfrey, Rothstein, and Laughery, 1985).

**Understanding the Warning**   The words and/or graphics of a warning must be understood by the user population. If words are used, they must be chosen carefully

and tested for comprehension. Do not use vague, ambiguous, or ill-defined terms; highly technical words or phrases; double negatives; or long, grammatically complex phrasing. Consideration must also be given to the primary languages of the user population. Symbols must be carefully chosen to convey the intended message, and this can be more difficult than one may think. Collins (1983), for example, tested comprehension of standard hazard symbols among mining industry personnel. In several cases respondents interpreted the symbol to mean the opposite of its intended meaning. The symbol for corrosive hazard, for example, was thought by 21 percent of the people to denote ''emergency hand-wash location!'' The symbol for emergency eye-wash location was interpreted by 24 percent of the people to mean ''eye irritant located here''!

At a minimum, a warning should contain the following fundamental elements:

- *Signal word*—to convey the gravity of the risk, for example, *danger, warning, caution.*
  - *Hazard*—the nature of the hazard.
  - *Consequences*—what is likely to happen if the warning is not heeded.
  - *Instructions*—appropriate behavior to reduce or eliminate the hazard.

An example of a minimum warning would be (Wogalter, Desaulniers, and Godfrey, 1985)

> DANGER
> HIGH VOLTAGE WIRES
> CAN KILL
> STAY AWAY

How specific a warning must be in spelling out hazards is a difficult question. Courts have often opted for a great deal of specificity in warnings. For example, the following warning was found to be inadequate in a court case:[7]

CAUTION: FLAMMABLE MIXTURE. DO NOT USE NEAR FIRE OR FLAME. CAUTION! WARNING! EXTREMELY FLAMMABLE! TOXIC! CONTAINS NAPHTHA, ACETONE, AND METHYL ETHYL KETONE. ALTHOUGH THIS ADHESIVE IS NO MORE HAZARDOUS THAN DRYCLEANING FLUIDS OR GASOLINE, PRECAUTIONS MUST BE TAKEN. USE WITH ADEQUATE VENTILATION. KEEP AWAY FROM HEAT, SPARKS, AND OPEN FLAME. AVOID PROLONGED CONTACT WITH SKIN AND BREATHING OF VAPORS. KEEP CONTAINER TIGHTLY CLOSED WHEN NOT IN USE.

It was found to be inadequate because it did not mention the danger of using the product in the vicinity of closed and concealed pilot lights (Kreifeldt and Alpert, 1985).

[7]*Florentino v. A.E. Dtaley Mfg. Co.* Massachusetts 416 N.E. 2d 998.

**550**   PART 6: HUMAN FACTORS: SELECTED TOPICS

There is a problem, however, in warning about all possible hazards inherent in the use and reasonable foreseeable misuse of a product. The problem is *warning overload*. That is, if there is a warning against every conceivable hazard, the effect of all the warnings may be so diluted as to make any one of them ineffective. Take, for example, a large industrial machine with electrical hazards, flammable liquids, high-pressure lines, sharp edges, pinch points, slippery surfaces, etc. Warning against all such hazards and, in addition, reasonable foreseeable misuses could result in virtually the entire machine being plastered with warning labels. It is doubtful that people working in and around such a machine would pay much attention to so many warnings.

**Heeding the Warning**   Just because a warning is sensed, received, and understood does not ensure that a person will heed or comply with the warning. These are some factors that may influence whether people heed a warning: whether the user is capable of performing the action required; whether the warning is remembered at the time and place where the action is required; whether heeding the warning will result in additional time, cost, inconvenience, or discomfort to users; and the riskiness and general carelessness of the individual.

### Effectiveness of Warnings

The ultimate measure of effectiveness is whether the warning was heeded by the user. Unfortunately, there has not been a great deal of research assessing the effectiveness of warnings by using behavioral measures. Most research on warning effectiveness assesses the perceived effectiveness by asking subjects which of several warnings they *think* would be most effective. There are, however, a few behavioral studies which may shed some light on the issue of effectiveness.

**Warnings in Instructions**   Warnings properly placed in instruction manuals that are used by people to operate, assemble, or repair a product can be quite effective. Wogalter, Fontenelle, and Laughery (1985), for example, found that placing a warning ("Wear rubber gloves and mask") at the beginning of an instruction sheet used to perform a chemistry experiment resulted in 87 percent of the subjects complying with the warning. When the warning was placed at the end of the instructions, however, only 44 percent complied. Using a survey technique, the Consumer Product Safety Commission (1980) reported that 69 percent of people who felt they had been exposed to warning labels or hazard-avoidance instructions related to installing CB antennas near power lines said that the warnings had caused them to consider the promixity of the power lines when selecting an installation site. There was also evidence that CB antennas installed *before* warning labels and hazard-avoidance instructions were made mandatory were mounted *closer* to power lines than were CB antennas installed *after* the warnings and instructions became mandatory.

Warnings within instructions, however, may be effective only when the instructions are being used. If the product is used again without rereading of the instructions, there is a good probability that the warning may be forgotten. For this reason, a warning is often placed on the product itself.

**On-Product Warnings**   The literature addressing the effectiveness of on-product warnings indicates that people often do not heed such warnings. Dorris and Purswell (1977) reported that of 100 subjects, not one even noticed a warning placed on the handle of a hammer they were asked to use to perform a task. The widely recognized lack of effectiveness of the warning on cigarette packages[8] ("Warning: The Surgeon General has determined that cigarette smoking is dangerous to your health.") has often been cited as evidence for the general lack of effectiveness of product warnings (McCarthy et al. 1984). To be fair, however, there are features of cigarette smoking that are not at all comparable to other on-product applications of warnings. Cigarette smoking, for example, may be addictive, it is pleasurable (at least to those who do the smoking), and considerable advertising is aimed at promoting smoking. In how many other situations is noncompliance with a warning addictive, pleasurable, and encouraged in the media? The lack of effectiveness of cigarette warnings, therefore, may be a special case rather than a general indictment of on-product warnings.

In a revealing study of on-product warnings Strawbridge (1985) had subjects scan a label on the back of a bottle of liquid adhesive to determine whether the adhesive could be used to glue two specific materials and if so, to do so. The label contained the following warning:

DANGER: Contains Acid. To avoid severe burns, shake well before opening.

Various conditions were tested including placement of the warning at the top, middle, or bottom of the label; highlighting with inverse type (white letters on a black background); and embedding the warning in a paragraph of text or starting the paragraph with the warning. Surprisingly, the addition of highlighting and the position of the warning (top-middle-bottom) had little effect on compliance. Embedding the warning, however, did reduce compliance. For the nonembedded conditions, 94 percent of the subjects noticed the warning, but only 81 percent read it. Even more surprising, although 81 percent of the subjects read the warning, only 47 percent complied with it. The reason given by the subjects who read the warning but did not comply was that they simply forgot; yet the time between reading the warning and opening the bottle was no more than 10 s!

More encouraging results came from a study reported by Godfrey, Rothstein, and Laughery (1985). They found that placing temporary warning signs on a copy machine ("*Caution:* Machine does not work. May cause delay. Use another machine."), a telephone ("*Caution:* Telephone is out of order. Money will be lost. Use other telephone."), and a drinking fountain ("*Warning:* Bad filter caused water contamination. Do not drink water.") were effective in modifying behavior in the desired manner. Compliance rates were 73 percent, 100 percent, and 67 percent for the copier, telephone, and water fountain, respectively.

Whether people will comply with a warning depends in part on the cost of compliance. Godfrey, Rothstein, and Laughery (1985) in another part of their study posted warning signs indicating that a door was broken and that to avoid injury people should (1) use an adjacent door, (2) use another exit 50 ft (15 m) away, or

---

[8]New warnings have been mandated, but their effectiveness has not, as yet, been assessed.