IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAROLINE PATTON GRIFFIN,
individually and as executor of the
estate of Lee Dixon Griffin, Jr.,

     Plaintiff,

       v.

TOYOTA MOTOR CORPORATION, et
al.,

     Defendants.

CIVIL ACTION FILE
NO. 1:23-CV-3107-TWT

## OPINION AND ORDER

This is a products liability case. It is before the Court on the Defendants'

Motion for Partial Summary Judgment [Doc. 125] and the Defendants' Motion

to Exclude [Doc. 127]. As explained below, the Defendants' Motion for Partial

Summary Judgment [Doc. 125] is GRANTED in part and DENIED in part and

the Defendants' Motion to Exclude [Doc. 127] is GRANTED.

## I.    Background[1]

This case arises out of an alleged design defect and failure to warn

regarding a 2017 Toyota Tacoma. The Defendants are various affiliated

---

[1] The operative facts on the Motion for Summary Judgment are taken
from the parties' Statements of Undisputed Material Facts and the responses
thereto. The Court will deem the parties' factual assertions, where supported
by evidentiary citations, admitted unless the respondent makes a proper
objection under Local Rule 56.1(B).

entities. Toyota Motor Corporation ("TMC") is responsible for the overall design, development and testing of Toyota vehicles and also manufactures and/or assembles numerous models of Toyota motor vehicles. (Defs.' Statement of Undisputed Material Facts ¶ 32). Toyota Motor North America ("TMNA") is responsible for the business efficiency and coordination among Toyota's North American sales, manufacturing, and engineering operations. (*Id.* ¶ 33). Toyota Motor Sales, U.S.A., Inc. ("TMS") is the authorized importer and a distributor of Toyota motor vehicles in certain geographic areas of the continental United States. (*Id.* ¶ 34). Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") supports Toyota's North American manufacturing operations as well as the planning and administration functions of Toyota's North American manufacturing, research, and development operations. (*Id.* ¶ 35). Finally, Toyota Motor Manufacturing, Texas, Inc. ("TMMTX") manufactures certain Toyota vehicles. (*Id.* ¶ 36).

Lee Griffin was the primary driver of a 2017 Toyota Tacoma. (*Id.* ¶ 9). That vehicle was equipped with a keyless, push button ignition, which Toyota refers to as the "Smart Key System." (*Id.* ¶ 4). If a driver parks the vehicle, leaves the engine running, closes the door, and exits with the Smart Key fob, the vehicle will beep three times. (*Id.* ¶ 19; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 19). Lee Griffin was diagnosed with tinnitus and with "normal to moderate noise induced and sensorineural hearing loss," each

in both ears. (Audiology Progress Notes, Doc. 128-2).

On July 4, 2022, Lee Griffin moved his Tacoma out of his garage to access his lawnmower. (Pl.'s Statement of Undisputed Material Facts ¶ 1). He put in noise-isolating earbuds so he could listen to music while doing so. (*Id.* ¶ 2; Site Inspection Findings Report, Doc. 127-3, at 4). After mowing the lawn, Lee Griffin returned the mower and pulled his Tacoma into the garage. (Pl.'s Statement of Undisputed Material Facts ¶ 3). He exited the truck while the Tacoma's engine was still running. (*Id.* ¶ 4; Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 4). He was likely still wearing his earbuds listening to music when he exited the vehicle. (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 43; Gill Expert Report, Doc. 125-3, at 16). That night, Lee Griffin woke up sick and ended up fainting in the bathroom. (Pl.'s Statement of Undisputed Material Facts ¶ 6). His wife, Caroline Griffin, had to help him back to bed. (*Id.*). Then he woke up again and said he needed help reaching the bathroom. (*Id.*). Caroline Griffin fainted after helping him. (*Id.*). When she regained consciousness, she found Lee Griffin in the bathroom and could not wake him. (*Id.* ¶ 7). She then returned to her bed and called 911. (*Id.*).

Atlanta emergency services responded on July 5, 2022. (*Id.* ¶ 8). The Atlanta Fire Department found extremely high levels of carbon monoxide, and Caroline Griffin needed to be carried out of the house. (*Id.*). Lee Griffin was

3

pronounced dead at the scene. (*Id.* ¶ 9). An autopsy found that he died due to accidental carbon monoxide poisoning from an automobile inadvertently continuing to run in the garage. (*Id.*). Based on these facts, Caroline Griffin filed suit individually and as executor of Lee Griffin's estate. The Defendants now move for summary judgment and to exclude certain testimony from one of the Plaintiff's proffered experts.[2]

## II.    Legal Standard

### A. *Daubert* Motion Standard

"Under Federal Rule of Evidence 702, expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014). The Rules of Evidence require a district judge to take on a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "In considering the proffered expert testimony, a trial judge is mindful the burden of establishing qualification, reliability, and

_____

[2] The Court will address the Plaintiff's Motions to Exclude in a separate order.

helpfulness rests on the proponent of the expert opinion." *Chapman*, 766 F.3d at 1304 (quotation marks and punctuation omitted).

## B. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III.    Discussion

The Defendants move to exclude warnings opinions of Joellen Gill and move for partial summary judgment. The Court will start by addressing the Motion to Exclude and then address the Motion for Partial Summary Judgment.

## A. Defendants' Motion to Exclude

The Defendants move to exclude certain opinions offered by the

Plaintiff's proffered human factors and warnings expert, Joellen Gill. (Defs.' Br. in Supp. of Mot. to Exclude, at 1-2). Specifically, the Defendants seek to exclude "opinions regarding alternative warnings or that a different warning would have changed the decedent's behavior at the time of the subject incident." (*Id.* at 19). They argue that such opinions are not based on reliable methodology, are unhelpful, and are untimely. (*Id.* at 8-19). The Court will grant the Defendants' Motion to Exclude.

The Court starts by considering the timeliness of the disclosure of these opinions. Under Rule 26, a witness retained to provide expert testimony must prepare a written report that includes "a complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i). The Court ordered the Plaintiff to "identify and provide reports for all experts who are expected to testify at the time of trial on or before June 12, 2024." (Order Extending Scheduling Order Deadlines, Doc. 81, at 2). For evidence that "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)," a party must disclose it "within 30 days after the other party's disclosure." FED. R. CIV. P. 26(a)(2)(D)(ii). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV.

P. 37(c)(1).

At her deposition on August 8, 2024, Gill was asked, "[i]n your opinion, what warnings should have Toyota provided for the 2017 Toyota Tacoma?" (Gill Dep., [Doc. 125-13], 65:17-18). In response, Gill stated, in part, "I am not a design engineer. I think it's improper for me to offer opinions related to specific warnings that should have been provided in a vacuum." (*Id.* 65:21-24). She then goes on to state that her "overarching opinion" is that Toyota chose a safety strategy that required individuals to take action to protect themselves from harm and that that strategy is the least effective way to protect people. (*Id.* 66:9-16). Later, she was asked whether she has "formed any opinions as to whether a different set of warnings or alerts would have changed Mr. Lee Griffin's behavior on the date of the subject accident?" (*Id.* 68:5-8). Her answer was, "I don't have any specific opinions about other warnings that would have changed his behavior, changed Mr. Griffin's behavior with respect to leaving his vehicle running inadvertently." (*Id.* 68:13-17).

Twelve days after her deposition, Gill wrote in her rebuttal report: "If Toyota had wished to give an effective external audible warning, Toyota could have designed the vehicle to blow its horn when left running without the key fob present in the vehicle." (Gill Rebuttal Report, [Doc. 125-9], at 4). She also asserted, "[a]n effective audible alert would have resulted in Mr. Griffin recognizing he had not turned off his vehicle and therefore would have resulted

7

in a change in his behavior." (*Id.*). The Plaintiff does not argue that these opinions were previously provided in Gill's initial report or deposition. Rather, she asserts (1) that it was a timely rebuttal made in response to Defendants' proffered expert's opinion on the vehicle's "feedback" and (2) that whatever prejudice exists was caused by Toyota scheduling the deposition before rebuttal reports were due. (Pl.'s Br. in Opp'n to Mot. to Exclude, [Doc. 153], at 14-15).

> The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence offered by an adverse party. A party may not offer testimony under the guise of "rebuttal" only to provide additional support for his case in chief. A plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief. As a result, a plaintiff may not seize upon language used in a defendant's expert report "as a chance to re-do their opening expert report." This is particularly true where the expert evidence being offered on rebuttal is evidence that supports an element of the plaintiff's prima facie case.

*Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016) (quotation marks and citations omitted); *see also ITT Corp. v. Xylem Grp., LLC*, 2012 WL 12871632, at *3 (N.D. Ga. Oct. 15, 2012) ("A party's opportunity to submit a rebuttal expert report is not license to expand its case-in-chief.").

The opinions that Gill was purportedly responding to were (1) Dr. Nathan Dorris and Harry Pearce's contention that "there are multiple sources of 'feedback' from the Tacoma that would have alerted a driver the vehicle was

still running, including the rear view mirror compass and anti-glare feature"
and (2) Dr. Dorris's opinion that Gill "[does] not share the opinions of Mr. Leiss
with respect to the three beeps," i.e., that the beeps "were insufficient at
alerting drivers to the fact that the vehicle was still running after they had
exited with the key fob just as Toyota's own engineers concluded." (Gill
Rebuttal Report, Doc. 125-9, at 4). It is unclear to the Court how stating that
the Tacoma blowing its horn would have been a feasible audible warning that
would have changed Lee Griffin's behavior responds to either of these.
Therefore, the Court does not view those opinions as proper rebuttal.

The Plaintiff provides no justification for Gill's failure to provide these
opinions in her initial report. (Pl.'s Br. in Opp'n to Mot. to Exclude, at 14-15).
Instead, she faults the Defendants for deposing Gill before the rebuttal reports
came out. (*Id.*). However, that does not obviate the prejudice caused by stating
an improper new opinion in the rebuttal report. In *Hamlett v. Carroll Fulmer
Logistics Corporation*, 176 F. Supp. 3d 1360, 1365 (S.D. Ga. 2016), one party
provided untimely new opinions and attempted to point to deposition questions
on the matter as proof of no prejudice. The court rejected that argument,
stating that accepting the argument would "neuter the rule and deny
adversaries the full benefit of pre-deposition, question-preparation time, if not
the option to obviate a deposition expense outright." *Id.* Thus, here, even if the
Defendants had the rebuttal report in hand and asked questions about it, there

9

would still have been prejudice from the untimely opinions.

Assuming *arguendo* that the opinions were not untimely, expert witness reports must, under Rule 26, "include both 'how' and 'why' the expert reached a certain result, not just conclusory opinions." *Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1276 (N.D. Ala. 2017) (citation omitted). Gill provides no reasoning, explanation, or citation to support her contention that having the vehicle blowing its horn would have been "effective" and "would have resulted in a change in [Lee Griffin's] behavior." (Gill Rebuttal Report, Doc. 125-9, at 4). Thus, these opinions do not satisfy the requirements of Rule 26. *See, e.g.*, *Jones*, 235 F. Supp. 3d at 1277 ("Dr. Hinshaw violated Rule 26, and did not put Novartis on notice, by failing to sufficiently provide the methods and bases that he alleges he used in opining on specific causation in his expert reports."); *Laux v. Mentor Worldwide, LLC*, 295 F. Supp. 3d 1094, 1102 (C.D. Cal. 2017) (excluding opinions under Rule 26 for "fail[ing] to provide the facts and data that Dr. Brawer considered in determining that Plaintiff's breast implants were 'toxic,' the methodology he employed in concluding they were 'toxic,' or how her 'toxic' implants caused her injury" (citation omitted)); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 878 (S.D. Ohio 2010) (finding that the proffered expert's initial report failed to comply with Rule 26(a) because "[w]ith one exception . . . Dr. Dahlgren never explain[ed] in his report how the bibliography supports his conclusion that a Plaintiff's cumulative benzene

exposure was sufficient to cause her disease"). For these reasons, the Court will grant the Defendants' Motion to Exclude.

## B. Defendants' Motion for Partial Summary Judgment

The Defendants move for summary judgment on the Plaintiff's failure-to-warn claim, failure-to-recall claim, punitive damages claim, "Joint Venture, Alter Ego, Agency, and Piercing the Corporate Veil of Toyota" claim, and joint and several liability claim. (*See generally* Defs.' Br. in Supp. of Mot. for Summ. J.).[3] The Court responds to each argument in turn.

### i.    Failure to Warn

The Defendants argue that summary judgment is warranted on the Plaintiff's failure to warn claim because the Defendants did not have a duty to warn and because the Plaintiff cannot establish a causal link between the allegedly inadequate warning and the subject incident. (Defs.' Br. in Supp. of Mot. for Summ. J., at 4-10).

### a.  Duty to Warn

Defendants contend that they did not have a duty to warn because the risk that running an automobile in a garage could lead to carbon monoxide

---

[3] The Defendants do not move for summary judgment on the Plaintiff's claims based on design defect. (*See* Defs.' Br. in Supp. of Mot. for Summ. J., at 25) ("The sole liability claims that can survive summary judgment are whether the 2017 Tacoma was defectively or negligently designed because it did not include automatic engine shut-off.").

poisoning is well known. (Defs.' Br. in Supp. of Mot. for Summ. J., at 4-6). Under Georgia law, "there is no duty resting upon a manufacturer or seller to warn of a product-connected danger which is obvious or generally known." *Moore v. ECI Mgmt.*, 246 Ga. App. 601, 606 (2000) (citations omitted). "Whether a duty to warn exists thus depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner." *Yaeger v. Stith Equip. Co.*, 177 Ga. App. 835, 836 (1986) (quotation marks and citation omitted).

If the Court were to accept the Defendant's framing and define the risk as the danger of leaving a car running in a garage, then this may well be one of those cases that can be resolved at this stage. *Cf. Vickery v. Waste Mgmt. of Ga., Inc.*, 249 Ga. App. 659, 660 (2001) (affirming grant of summary judgment because "the fact that the truck which backed over Kathy Vickery would sometimes move in reverse was an obvious and well-known danger that did not require a warning from" the defendants). This framing could be appropriate if the Plaintiff and/or decedent knew that the car was running, failed to take any action, and was injured as a result. However, there are no undisputed facts indicating that the decedent knew he left the vehicle running when he exited the vehicle. Nor is there any evidence that the decedent ever

previously heard the three beeps before or even knew what they meant. To the contrary, the Defendants state, "[t]here is no evidence that the decedent ever left the Tacoma's engine running on any prior occasion." (Defs.' Br. in Supp. of Mot. for Summ. J., at 5-6).

Accordingly, this case bears similarities to *Sheckells v. AGV-USA Corporation*, 987 F.2d 1532 (11th Cir. 1993). That case involved injuries suffered when the plaintiff got into a motorcycle accident while wearing a helmet manufactured by the defendant. *Id.* at 1533. "The district court relied on several Georgia cases for the proposition that it is a matter of common knowledge that operating a motorcycle carries with it certain inherent dangers." *Id.* at 1535 (quotation omitted). The Eleventh Circuit found that this was not the proper framing of the issue: "While recognizing the inherent hazard of operating a motorcycle, these cases do not establish as a matter of Georgia law that safety precautions, such as a helmet, openly and obviously provide insignificant protection at speeds of 30 to 45 miles an hour." *Id.* Likewise, here, just because running a car in a garage is an open and obvious danger does not mean that it is open and obvious that a car will continue to run and emit carbon monoxide after the key is taken out of the vehicle. Given this, the Court finds that the question of whether there was a duty to warn is not ripe for adjudication at this stage of litigation. The Court will not grant summary judgment to the Defendants on this basis.

### b. Causation

The Defendants also move for summary judgment on this count for lack of proximate causation. They provide three bases for granting summary judgment in their favor: (1) the risk of inhaling carbon monoxide fumes was already known by the Plaintiff and decedent; (2) there is no evidence that the Plaintiff or decedent read the warnings and instructions regarding the operation of the Smart Key System that were located in the Tacoma's owner's manual; and (3) there is no evidence that any inadequacies in the Tacoma's exterior audible alerts or lack of exterior visual alerts contributed to the decedent's failure to turn off the vehicle's engine after he parked it. (Defs.' Br. in Supp. of Mot. for Partial Summ. J., at 6-10). The Court will permit this claim to proceed only with respect to the visual alerts.

### 1. Known-Risk of Carbon Monoxide

For the Defendants' first argument, the Plaintiff argues that the Defendants failed to adequately warn about was the risk of the engine continuing to run *after the Smart Key was removed from the truck* in an enclosed space. (Pl.'s Br. in Opp'n to Mot. for Partial Summ. J., at 15 (emphasis added)). For the reasons stated above, the fact that the risk of inhaling carbon monoxide fumes was known to the Plaintiff and decedent is insufficient to grant summary judgment at this stage.

### 2. Owner's Manual Reading

Turning to Defendants' argument regarding the manual, Plaintiff's first response is that "Toyota is incorrect that the Griffins did not read the owners' manual." (*Id.* at 20). The only evidence she points to for support is her deposition testimony. (*Id.*). When asked during her deposition whether the decedent had ever read the owner's manual, the Plaintiff responded, "[t]hat would be speculation. I don't know." (Griffin Dep., [Doc. 147-18], 45:6-8). Then, when asked whether she had read the owner's manual before the accident, she answered, "I could have flipped through. I don't want to say 'no' because I could have flipped through and read something here or there when he first got it and we were excited." (*Id.* 45:14-19).

This is insufficient. As the Eleventh Circuit has stated, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Poer v. Jefferson Cnty. Comm'n*, 100 F. 4th 1325, 1335 (11th Cir. 2024) (citation omitted). The assertion that the decedent read the owner's manual is—in the Plaintiff's own word— "speculation." (Griffin Dep. 45:8). The Court therefore will not infer that he read the relevant warning. Plaintiff's statement that she "could have flipped through and read something here or there" is similarly unavailing. Even if the Court infers that she did in fact "flip[] through" the owner's manual, it is purely conjectural that the relevant warnings were part of the manual she flipped through. Similarly, the court in

*Gaddy v. Terex Corp.*, 2017 WL 1493615, at \*9 (N.D. Ga. Apr. 26, 2017) (citations omitted), found "the evidence, at best, show[ed] that Plaintiff read the Operator's Manual 'as needed.' Plaintiff did not present any evidence to show that he actually read or was aware of the load capacity warnings in the Operator's Manual." The court held that the plaintiff failed to show proximate causation as a result. *Id.* Here, the Court follows this reasoning to conclude that the Plaintiff has failed to present any evidence that she or the decedent ever read the relevant warning.

### 3. Necessity of Reading Owner's Manual

The Plaintiff alternatively argues that reading the manual is not necessary for proximate causation in this case. (Pl.'s Br. in Opp'n to Mot. for Partial Summ. J., at 20-21).

> While failure to read instructions or printed warnings will prevent a plaintiff from recovering on a claim grounded on failure to provide adequate warning of the product's potential risk, failure to read a warning does not bar recovery when the plaintiff is challenging the adequacy of the efforts of the manufacturer or seller to communicate the dangers of the product to the buyer or user.

*Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 75 (1995) (quotation marks and citations omitted). Thus, Plaintiff's argument depends on her claim being one for inadequate communication of the warning. "Failure to communicate an adequate warning involves such questions . . . as to location and presentation of the warning." *Id.* (citation omitted).

16

As far as the Court can tell, neither party has provided a copy of the owner's manual or any part thereof. Instead, the Plaintiff points to statements made by Toyota's human factors expert, Dr. Nathan Dorris, in his deposition. (Pl.'s Br. in Opp'n to Mot. for Partial Summ. J., at 20). Importantly, the testimony at issue is a back-and-forth about the *content* of the warning. (*See* Dorris Dep. 84:21-86:9). Nothing in Dorris's testimony states or suggests that the "presentation and location" was inadequate. *Wilson Foods Corp.*, 218 Ga. App. at 75. Since this is a content-based dispute, the failure to read the warning is fatal to the Plaintiff's claim with respect to the written warning. *See Camden Oil Co. v. Jackson*, 270 Ga. App. 837, 840 (2004) ("As Jackson did not read the warning, a jury should not be allowed to consider the adequacy of the contents of the warning as a basis for imposing liability on Camden Oil.").

### 4. External Warnings

Finally, the Plaintiff also bases this claim on her contention that the three beeps of the vehicle were inadequate and that an alternative warning system should have been installed. The Defendants argue that there is no evidence that an alternative adequate warning system would have caused the decedent to change his behavior. (Defs.' Br. in Supp. of Mot. for Partial Summ. J., at 8-10). The Defendants specifically state that Plaintiff's keyless ignition design and warnings expert, Peter Leiss, deferred the issue of warnings causation to a human factors expert and that Plaintiff's human factors expert,

Joellen Gill, only provided causation opinions in the now-excluded parts of her rebuttal report. (*Id.*, at 9-10). In response, the Plaintiff argues that a visual warning and a unique sound would be adequate alternatives. Furthermore, she asserts that expert testimony on causation is not even necessary in this case. (*Id.* at 18-19).

The Court will permit this theory of the claim to continue. While the Defendants make a strong argument that a jury would not be able to conclude—without expert testimony—whether a hearing-impaired person with tinnitus would hear a unique tone while likely listening to music on noise-isolating earbud, the Court finds their arguments relating to the visual warning unpersuasive. (Reply Br. in Supp. of Mot. for Partial Summ. J., at 12). The Defendants have proffered no evidence indicating that the decedent had impaired vision. Rather, they argue that the proposed visual warning was prohibited by Federal Motor Vehicle Safety Standard (FMVSS) 108, a federal regulation. (*Id.* at 12). The Defendants do not explain how it was prohibited. Instead, they just cite to a statement made by a corporate representative in a deposition for a different case. (Response to Pl.'s Statement of Undisputed Material Facts ¶ 38). There, the deponent simply stated—without explanation—that implementing the proposed visual warning would have violated FMVSS 108. (Response to Pl.'s Statement of Undisputed Material Facts, Ex. 9, [Doc. 165-9], at 4). However, the Defendants or their

representatives asserting that a particular alternative would violate a regulation does not necessarily make it so.

Moreover, Leiss stated in his rebuttal report that DaimlerChrysler recalled 2003-2005 Ram trucks and added a new software that caused the vehicle to flash the head lights and sound the horn when the vehicle was left running, the transmission was not in park, and the driver's door was opened. (Leiss Rebuttal Report, [Doc.149-26], at 3). It is unclear why that would be permitted by FMVSS 108 and the proposed visual warning would not be. Therefore, without more, the Court cannot definitively say that the proposed visual warning would be a violation of FMVSS 108. Since it appears that the decedent's vision was normal, and there is no sufficient basis for concluding that the Defendants could not have implemented the proposed visual warning, proximate causation on this matter is best left to the finder of fact. *See Wilson Foods Corp.*, 218 Ga. App. at 75 ("Generally, questions of negligence and proximate cause are peculiarly questions for the jury." (citations omitted)). The Court will not grant summary judgment as to the Plaintiff's failure to warn claim on this basis.

### ii.    Failure to Recall

The Defendants argue that the "Plaintiff's Failure to Recall Claim Fails As a Matter of Law" because such a claim is "not recognized stand-alone liability theories in Georgia." (Defs.' Br. in Supp. of Partial Mot. for Summ. J.,

at 10). However, the Complaint contains no such claim. Instead, the Defendants makes this argument based on language from paragraphs supporting the Plaintiff's failure-to-warn claim. (*See* Defs.' Br. in Supp. of Partial Mot. for Summ. J., at 10; Compl. ¶¶ 87, 89). Since the Plaintiff does not assert a failure-to-recall claim, this argument fails.

### iii.    Punitive Damages

A plaintiff may recover punitive damages "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). "Negligence alone, even gross negligence, is insufficient to support punitive damages. Punitive damages cannot be imposed without a finding of culpable conduct based upon either intentional and wilful acts, or acts that exhibit an entire want of care and indifference to consequences." *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 173 (2000) (citations omitted). "When considering punitive damages at the summary judgment stage, it is important to remember that the issue of punitive damages is usually a matter for the jury." *Little v. Ford Motor Co.*, 2017 WL 6994586, at *17 (N.D. Ga. Dec. 21, 2017) (quotation marks and citation omitted). The Defendants assert that the Plaintiff has failed to provide evidence of such willful or wanton actions and instead has presented, at most,

a bona fide engineering dispute that cannot be subject to punitive damages. (Defs.' Br. in Supp. of Partial Summ. J., at 12). The Court finds that there is a genuine issue of material fact about whether punitive damages are warranted.

The Eleventh Circuit has said that Georgia case law "suggests that the wanton and willful standard is not satisfied where there is a bona fide dispute as to the propriety of the defendant's actions." *Ivy v. Ford Motor Co.*, 646 F.3d 769, 776-77 (11th Cir. 2011). Moreover,

> as a matter of common sense and common experience with respect to the meaning of wanton conduct, merely finding an after-the-fact expert to opine that a product is defective cannot be sufficient to create a jury question on the issue of wantonness—defined as willful conduct based on an actual intention to do harm or wanton conduct that is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit of actual intent—when the product satisfied the government and industry standards extant at the earlier relevant time.

*Id.* at 777 (citation omitted). The Defendants contend that they have complied with all relevant government and industry standard and that no evidence of willful or wanton conduct exists. (Defs.' Br. in Supp. of Partial Summ. J., at 11-20; Reply Br. in Supp. of Partial Summ. J., at 1-11). Accordingly, they assert that *Ivy* compels summary judgment here. (*Id.*).

The Plaintiff does not dispute that the Defendants have complied with all the relevant regulations and standards. Instead, she points to several other bases for concluding that the Defendants were "so charged with indifference to the consequences ... [as to be the] equivalent in spirit to actual intent" and thus

21

constitutes wanton conduct. *Chrysler Corp v. Batten*, 264 Ga. 723, 726 (1994) (alteration in original) (quotation marks and citation omitted). One such basis is a spreadsheet that Toyota created for a deposition in a separate case. It lists out 117 different instances in which a person has reported or made a claim alleging that they exited the vehicle with the key fob and the engine continued to run. (Spreadsheet of Incidents, Complaints, and Lawsuits, Doc. 149-11).

"Evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation." *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338-39 (5th Cir. 1980) (citations omitted).[4]

> Whether a reasonable inference may be drawn as to the harmful tendency or capacity of [a product] from prior failures depends upon whether the conditions operating to produce the prior failures were substantially similar to the occurrence in question. The requirement that the prior accident not have occurred at too remote a time is a special qualification of the rule requiring similarity of conditions. The admission of such evidence is also subject to the reasonable discretion of the trial court as to whether the defendant is taken by unfair surprise and as to whether the prejudice or confusion of issues which may probably result from such admission is disproportionate to the value of such evidence

---

[4] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit . . ., as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

*Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 400 (5th Cir. 1965) (citations omitted). Toyota argues that the instances referenced in the spreadsheet should be disregarded because "Plaintiff has not deposed a Toyota witness about these other incidents or otherwise attempted to lay a foundation that any of these alleged incidents are substantially similar to the subject incident." (Reply Br. in Supp. of Partial Mot. for Summ. J., at 10-11).[5]

However, the document speaks for itself on this matter. A review of the spreadsheet shows that many of the incidents involved reports of individuals exiting the vehicle with the fob and left the vehicle running in the garage. (Spreadsheet of Incidents, Complaints, and Lawsuits, Doc. 149-11). In several incidents, the running car caused injuries and/or fatalities from carbon monoxide poisoning, much like what occurred here. (*Id.*). To use just one example, two fatalities from monoxide poisoning occurred in 2013 when the driver "[p]arked [i]n garage on ground floor of two story home, forgot to turn off the engine or pressed the start button but was unsuccessful, could not hear engine running as she entered their home, vehicle ran out of gas." (*Id.* at 11).

There are differences between some of the events detailed in the

_____

[5] The Defendants do not raise remoteness in time, unfair surprise, or confusion as issues at this time. If the Defendants seek to exclude this evidence on grounds other than similarity, they may do so in a future motion in limine.

spreadsheet and the present case. Many of the described incidents did not result in any carbon monoxide injuries but that does not make them inadmissibly dissimilar. *See Borden, Inc. v. Fla. East Coast Ry. Co.*, 772 F.2d 750, 755 (11th Cir. 1985) ("Although the results of the two incidents were dissimilar, this difference is insubstantial in considering the issue of the foreseeability of this type of vandalism."). Moreover, even though the vehicles involved were different makes and models, they all were equipped with the same Smart Key system. (*Id.* at 1). Overall, these incidents satisfy the similarity requirements for admissibility of past accident evidence. *See, e.g.*, *Jones & Laughlin Steel Corp.*, 348 F.2d at 400 (holding that "[t]he Hodges Jal Klamps and pendant lines were similar to those here involved, and they were in use on a crane serving a similar purpose," despite the fact that "Hodges' crane was the larger of the two. The weight of the concrete slab was not proved, nor was the prior use or condition of Hodges' pendant lines and Jal Klamps proved, nor whether the boom was in motion or resting").

Viewing the evidence in the light most favorable to the non-moving party, a jury could conclude that the Defendants were aware of the alleged defect[6] before the decedent bought the car but willfully or wantonly ignored the issue despite the consequences. *Cf. Little*, 2017 WL 6994586, at *17. That

---

[6] The Defendants do not move for summary judgment on the issue of whether there was a design defect.

is sufficient for this claim to survive the present Motion.

    iv.    **"Joint Venture, Alter Ego, Agency, and Piercing the Corporate Veil of Toyota"**

While the Complaint messily lumps together four different legal concepts in one count, the Plaintiff focuses her response on the alter ego theory. The Court follows suit.

> Under the alter ego doctrine, equitable principles are used to disregard the separate and distinct legal existence possessed by a corporation where it is established that the corporation served as a mere alter ego or business conduit of another. The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility. Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control.

*Renee Unlimited, Inc. v. City of Atlanta*, 301 Ga. App. 254, 259-60 (2009) (quotation marks and citations omitted). The Defendants argue that there is no evidence that they disregarded their corporate separateness. The Court agrees and will grant summary judgment on this count.

The Plaintiff primarily focuses her brief on the Form 20-F that Defendant TMC filed with the SEC in 2024. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 22-24). That document states in part,

> The consolidated financial statements include the accounts of TMC, its subsidiaries that are controlled by TMC, and those structured entities that are controlled by Toyota. Toyota controls an entity when Toyota is exposed or has rights to variable returns

> from involvement with the entity, and has the ability to affect
> those returns by using its power over the entity.

(Toyota 2024 Form 20-F Excerpts, [Doc. 147-20], at F-11). The Plaintiff argues this constitutes an admission Defendant TMC exercises control over its subsidiaries. (Pl.'s Br. in Opp'n to Partial Mot. for Summ. J., at 24-25). However, that is not enough. In *US Magnesium, LLC v. ATI Titanium, LLC*, 2017 WL 913596, at *7 (D. Utah Mar. 7, 2017), the plaintiff "point[ed] to joint financial statements and SEC filings to suggest that they show Allegheny's dominance and control over ATI–Ti." The court rejected that argument stating, "[v]arious courts have held that these filings, by themselves, cannot satisfy the alter ego test." *Id.* (compiling cases).

The other evidence that the Plaintiff points to is the fact that Defendant TMC shares officers with its subsidiaries. (Pl.'s Br. in Opp'n to Partial Mot. for Summ. J., at 24). She does not state how many officers are shared and only points to one example. (*Id.*). This is likewise insufficient. In *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1312 (11th Cir. 2022) (quotations omitted), the plaintiff argued that "some of Teck's corporate officers or leadership are also officers of Teck's U.S.-based subsidiaries and that Teck consolidates its financial statements with those of its US-subsidiaries." While noting that those are factors to use when assessing whether a subsidiary is an alter ego, the Eleventh Circuit held that "they are not by themselves sufficient to establish a subsidiary's alter-ego status." *Id.*

(citation omitted).

Finally, the Plaintiff identifies a statement from Defendant TMC's Code of Conduct, asserting, "[t]his Code of Conduct applies to Toyota Motor Corporation, its board of directors, all its team members and its consolidated subsidiaries (all together referred to as "Toyota" in this Code)." (Code of Conduct, [Doc. 147-21], at 6). The Plaintiff appears to be arguing that the fact that the Code of Conduct applies to subsidiaries shows that Defendant TMC exerts control over them. The court in *Morrissey v. ASD Shared Servs., LLC*, 2014 WL 11460483, at *17 (N.D. Ga. July 24, 2014), rejected an almost identical argument. The Court will do so as well.

Overall, the Court finds that the evidence on the record individually and collectively do not create a genuine issue of material fact as to whether the subsidiaries in this case were alter egos of the parent company. The Court will therefore grant summary judgment on this count.

### v. Joint and Several Liability

Finally, the Defendants argue that Georgia has abolished joint and several liability by statute and that they therefore cannot be held jointly and severally liable as requested in Count VIII. (Defs.' Br. in Supp. of Mot. for Partial Summ. J., at 23-25). The Court disagrees.

The statute that the Defendants assert abolished joint and several liability states, in part, as follows:

27

> Where an action is brought against one or more persons for injury to person or property, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the person or persons who are liable according to the percentage of fault of each person. Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, *shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.*

O.C.G.A. § 51-12-33(b) (emphasis added). To say that this provision abolishes joint and several liability is too strong of a statement. As the Georgia Supreme Court has said

> When fault is divisible and the other requirements of OCGA § 51-12-33 (b) are met, then the trier of fact "shall" apportion. If fault is indivisible, then the trier of fact cannot carry out the statute's directive of awarding damages "according to the percentage of fault of each person" and the apportionment statute does not govern how damages are awarded.

*Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 572 (2019) (citing *id.*).

The question of whether joint and several liability applies therefore depends on the divisibility of the fault. The court in *Loudermilk* explained that "the fault resulting from concerted action (in its traditional, common-law form) is not divisible as a matter of law and, therefore, cannot be apportioned." *Id.* at 574; *see also Hansford v. Veal*, 369 Ga. App. 641, 654 (2023) ("According to the [Georgia] Supreme Court, concerted action, also known as civil conspiracy, invokes the common law doctrine of imputed fault based on a legal theory of mutual agency, and, because such fault is not divisible as a matter of law, the

28

fault cannot be apportioned." (citations omitted)).

> The essential element of a civil conspiracy is a common design. The existence of a conspiracy may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances. It is usually within the province of the jury to draw such inferences; and so cases involving an alleged civil conspiracy are typically not resolved on summary judgment.

*Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty.*, 298 Ga. 221, 225-26 (2015) (citations and quotation omitted).

Here, the Defendants consist of a parent company and its wholly owned subsidiaries whose interests are aligned in making the most profit as possible from selling vehicles. They are accused of selling defective vehicles, and there are documents in which some of the Defendants discussed with each other the alleged defect at issue. (Doc. 147-1; Doc. 147-15; Doc. 149-14). Given these facts, the Court cannot say as a matter of law that the Defendants did not engage in concerted action. The Court will not dismiss Count VIII.

## IV.    Conclusion

For the foregoing reasons, the Defendants' Motion for Partial Summary Judgment [Doc. 125] is GRANTED as to Count V and DENIED as to Counts III, IV, and VIII. Furthermore, the Defendants' Motion to Exclude [Doc. 127] is GRANTED.

SO ORDERED, this ___18th___ day of June, 2025.

THOMAS W. THRASH, JR.
United States District Judge