IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAROLINE PATTON GRIFFIN,
individually and as executor of the
estate of Lee Dixon Griffin, Jr.,

      Plaintiff,

          v.

TOYOTA MOTOR CORPORATION, et
al.,

      Defendants.

CIVIL ACTION FILE
NO. 1:23-CV-3107-TWT

## OPINION AND ORDER

This is a products liability case. It is before the Court on the Plaintiff's

Motion to Exclude Randall Tackett's Testimony [Doc. 130], the Plaintiff's

Motion to Exclude Angela McGrath's Testimony [Doc. 131], the Plaintiff's

Motion to Exclude Nathan Dorris's Testimony [Doc. 132], and the Plaintiff's

Motion to Exclude Harry Pearce's Testimony [Doc. 133]. As explained below,

the Plaintiff's Motion to Exclude Randall Tackett's Testimony [Doc. 130] is

GRANTED, the Plaintiff's Motion to Exclude Angela McGrath's Testimony

[Doc. 131] is GRANTED, the Plaintiff's Motion to Exclude Nathan Dorris's

Testimony [Doc. 132] is GRANTED in part and DENIED in part, and the

Plaintiff's Motion to Exclude Harry Pearce's Testimony [Doc. 133] is

GRANTED in part and DENIED in part.

## I.    Background

This action involves an alleged design defect and failure to warn

regarding a 2017 Toyota Tacoma. A more detailed description of the underlying facts may be found in the Court's Opinion and Order regarding the Defendants' Motion for Partial Summary Judgment. The Plaintiff now moves to exclude testimony from four of the Defendants' proffered experts.

## II.    Legal Standard

"Under Federal Rule of Evidence 702, expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014). The Rules of Evidence require a district judge to take on a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "In considering the proffered expert testimony, a trial judge is mindful the burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Chapman*, 766 F.3d at 1304 (quotation marks and punctuation omitted).

## III.    Discussion

The Plaintiff seeks to exclude the entire testimony of Randall Tackett and Angela McGrath as well as part of the testimony of Nathan Dorris and

Harry Pearce II. The Court considers each proffered expert in turn.

## A. Randall Tackett

Randall Tackett states two opinions in his expert report:

1. Mr. Griffin consuming 1.2 standard drinks within the hour before death is inconsistent with the evidence described above. Rather, the timeline of events is consistent with Lee Griffin ingesting higher amounts of alcohol earlier on July 4, 2022, which his body would have metabolized from the time he ingested the alcohol until his death.

2. It is more likely than not that on the evening of July 4, 2022 Mr. Griffin's blood alcohol concentration was at a level that could have affected his reaction time, hearing, judgment, memory, reasoning and ability to detect danger including his ability to turn off his Toyota Tacoma and/or recognize that it was still running in the garage.

(Tackett Report, [Doc. 130-1], at 4, 6 (emphasis omitted)). The Plaintiff does not argue that Tackett is unqualified to give these opinions. Instead, she asserts that the opinions should be excluded as "irrelevant, unhelpful, unreliable, and unfairly prejudicial." (Pl.'s Br. in Supp. of Mot. to Exclude Tackett Testimony, at 4). The Court will exclude these opinions.

Under *Daubert*, there are four factors to consider when determining reliability: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted). Here, Tackett used

retrograde extrapolation to estimate the decedent's blood alcohol content at various times prior to the decedent's death. (Defs.' Br. in Opp'n to Mot. to Exclude Tackett's Testimony, [Doc. 143], at 16; Tackett Expert Report, at 4). The Plaintiff does not challenge retrograde extrapolation as a general theory. She argues instead that Tackett does not have sufficient facts to reliably do a retrograde extrapolation. (Pl.'s Br. in Supp. of Mot. to Exclude Tackett's Testimony, at 6-12; Reply Br. in Supp. of Mot. to Exclude Tackett's Testimony, at 7-10).

Specifically, the Plaintiff notes that there is no known time of death; no specific time of when the car was parked; and no evidence as to when, what, or how much the decedent drank. (Pl.'s Br. in Supp. of Mot. to Exclude Tackett's Testimony, at 7-9). The Defendants argue that these gaps in the data go to weight rather than admissibility. (Defs.' Br. in Opp'n to Mot. to Exclude Tackett's Testimony, at 17). The Court cannot agree.

In *Ames v. Rock Island Boat Club*, 2010 WL 3174050, at *4 (C.D. Ill. Aug. 10, 2010), the proffered expert, M.L. Rehberg, used retrograde extrapolation to estimate what an individual's blood alcohol level was. The court excluded that testimony stating,

> At this point, Mr. Rehberg only knows that Irwin had some number of drinks at the Rock Island Boat Club, and that, 11-12 hours after leaving there (and after which he had more drinks at the Triangle Inn), he had a blood alcohol level of .199. On these facts, for instance, it is possible that Irwin had only a few drinks early in the afternoon at the Rock Island Boat Club, which did not

render him visibly intoxicated, that he completely sobered up by
8:00 P.M. (when he went to the Triangle Inn), and that he drank
enough at the Triangle Inn to result in the blood alcohol level
measured at 5:00 A .M. This scenario would result in a finding of
no liability for the Rock Island Boat Club, as there would be no
way that it knew or should have known that Irwin was or would
become intoxicated, but it is not accounted for in Mr. Rehberg's
opinion that Irwin was visibly intoxicated throughout his time at
the Rock Island Boat Club. Therefore, Mr. Rehberg's testimony
extrapolating from the 5:00 A.M. blood alcohol test back to
determine Irwin's previous afternoon and evening blood alcohol
levels at the two dram shops must be excluded, as it does not
reliably apply the theory to the facts at hand.

*Id.* at *5; *see also id.* at *4 ("[I]t is just too big of a jump to say that a person
was intoxicated 11-17 hours before testing with a given blood alcohol level
when one only know what time he had first drink [sic] and his blood alcohol
level 17 hours later.").

Here, there are even bigger reliability issues. First, the lack of known
timing makes it unclear how far back to extrapolate. Tackett provides
estimates of the decedent's blood alcohol content as early as 1-2 hours before
his death and as far back as 14-15 hours before his death. (Tackett Expert
Report, at 4). Consequently, the estimated blood alcohol content ranges widely
from 0.046 to 0.297, depending on how far back one estimates and how fast the
decedent metabolized. (*Id.*). Furthermore, there is no evidence that the
decedent drank a drop of alcohol prior to parking the vehicle. (Tackett Dep.,
[Doc. 130-2], at 15:24-17:2). Similar to *Ames*, it is just as consistent with the
evidence that the decedent came into the residence after mowing and drank

alcohol later that night, which caused him to have a blood alcohol level of .031 at his autopsy. If that is what happened, then the alcohol consumption would play no role in the decedent's ability to detect that the vehicle was running or his ability to turn it off.[1]

By contrast, in the cases that the Defendants cite, it is not possible that the intoxication of the individual could have occurred after the act that caused the injuries, often because the individual died as an immediate consequence of the act. *See, e.g.*, *Mcgarity v. FM Carriers, Inc.*, 2012 WL 1028593, at *2 (S.D. Ga. Mar. 26, 2012) (explaining that prior to the vehicle collision that caused the injuries, "Plaintiff and Jaffe had been to dinner and a bar where they consumed alcoholic beverages" and that the allegedly intoxicated driver, Jaffe, died in the collision); *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 960 (11th Cir. 2014) (stating that the decedent's urine tested positive for alcohol after he had fallen to his death and that the "Defendants used the measurement only to corroborate their contention that [the decedent's] own negligence contributed to his death *because he had been drinking before his fall*" (quoting *Collins v. Marriott Int'l, Inc.*, 2012 WL 12854839, at *10 (S.D. Fla. Oct. 11, 2012)

---

[1] The Defendants provide no evidence from which a reasonable person could conclude that a person would be able to detect that the vehicle was running from inside the house. In fact, the Plaintiff was in the house too, and there is no evidence that she could hear the vehicle running or consumed any intoxicating substances that day.

(emphasis added))); *Head v. Thrash*, 2023 WL 3664442, at *1 (explaining that the toxicology report showed the presences of alcohol and cocaine in the decedent's system at the time he died by a vehicle collision); *Roberts v. Mitchell*, 2021 WL 2099306, at *1 (N.D. Fla. Mar. 31, 2021) ("The accident occurred around 3:40 a.m. on U.S. Highway 98 in Okaloosa County. S.R.[, the decedent,] was in the middle of the road at the time of the accident, and was wearing dark clothes and had alcohol in his system."); *Jones v. Stone*, 516 F. App'x 866, 871 (11th Cir. 2013) (explaining that "[t]he Plaintiffs also contend that the district court erred by admitting evidence that Mr. Jones had drugs and alcohol in his system (along with empty beer cans and drug paraphernalia in his vehicle) at the time of the incident," not because it was unreliable but because it would impugn the individual's character).[2]

These shortcomings are perhaps why Tackett had to write his opinion as conjecture: "It is more likely than not that on the evening of July 4, 2022

---

[2] Moreover, the expert testimony in *Hightower v. Goldberg*, 2018 WL 296955, at *1-2 (M.D. Ga. Jan. 4, 2018), was not about a toxicology report at all. It was a legal malpractice case in which the expert was an attorney who "opined that Defendants breached the applicable standard of care, that their breach caused Plaintiff's state court case to be dismissed, and that, absent Defendants' breach, Plaintiff likely would have prevailed in state court." *Id.* at *2. "Defendants d[id] not contest Mr. Beauchamp's qualifications, methodology, or the relevance of his opinions." *Id.* Likewise, the expert in *United States v. Holland*, 722 F. App'x 919, 923-24 (11th Cir. 2018) (per curiam), was proffered to testify about "non-traditional financial transactions." These cases do not show that the toxicology opinions at issue here are reliable.

Mr. Griffin's blood alcohol concentration was at a level *that could have affected* his reaction time, hearing, [etc.]" (Tackett Expert Report, at 6) (emphasis added).[3] These reliability arguments specifically apply to the second opinion. While the first opinion does not suffer from the same deficiencies, the Defendants do not explain the relevance of the first opinion without the second opinion. Without being able to reliably show that his blood alcohol content affected his ability to detect that the vehicle was still running or his ability to turn off the vehicle, the fact that the evidence is inconsistent with the decedent drinking 1.2 standard drinks within the hour of his death is irrelevant, even if true. For these reasons, the Court concludes that the opinions of Tackett are inadmissible and will grant the Plaintiff's Motion to Exclude.

## B. Angela McGrath

The Defendants have proffered Angela McGrath as an expert witness to testify about the following opinions:

> a. [The United States Consumer Product Safety Commission ("CPSC")] death certificate data shows that vehicles with and without keyless ignition have inadvertently been left running in

---

[3] In addition to demonstrating the speculative nature of the opinion, this phrasing undermines the helpfulness of the testimony. It does not assist the jury to merely them that it was *possible* that the decedent's faculties were affected by alcohol. *See Krise v. SEI/Aaron's, Inc.*, 2017 WL3608189, at \*4 (N.D. Ga. Aug. 22, 2017) (granting a motion to exclude an expert witness because "Sherr's consistent use of 'may,' 'can,' and 'could' makes Sherr's statements merely possible, not more probable. A statement that something is merely possible does not logically advance a material aspect of the Plaintiffs' case" (quotation marks and citations omitted)).

enclosed spaces (see § V.B.1 below).

b. Available CPSC death certificate data does not show a consistently increasing trend of accidental carbon monoxide poisoning from passenger vehicle exhaust in enclosed spaces (see § V.B.2 below).

c. The proportion of combustion engine vehicles on the road with keyless ignition is increasing over time, however, even by 2021, the majority of vehicles still have conventional keys (see § V.C.1 below).

d. While number of registered vehicles with keyless ignition and without [automatic engine time-out ("ETO")] has increased steeply since 2011, the rates of accidental carbon monoxide poisoning from passenger vehicle exhaust in enclosed spaces has exhibited no corresponding, consistently increasing trend (see § V.D below).

(McGrath Expert Report, [Doc.131-6], at 3) (footnote omitted)). The Plaintiff argues that these opinions are unreliable, unhelpful and merely parrot someone else's statements.[4] (Pl.'s Br. in Supp. of Mot. to Exclude McGrath's

---

[4] In a footnote, the Plaintiff also argues that McGrath is unqualified. (Pl.'s Br. in Supp. of Mot. to Exclude McGrath's Testimony, [Doc. 131], at 3 n.1). The thrust of her argument is that McGrath does not have a Ph.D. and that her experience primarily comes from supplying opinions to corporate defendants. (*Id.*). However, McGrath has a Bachelor of Science in Statistics, a Master of Arts in Applied Statistics, 27 years of experience in consulting, and experience teaching statistics. (McGrath Curriculum Vitae, [Doc. 131-1], at 3). A Ph.D. is not required to be a qualified expert. *See, e.g.*, *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1293 (N.D. Fla. 2017) ("A witness need not be the best or most qualified authority in a field to be admitted as an expert. [An expert witness] need only possess enough general knowledge of a subject that his testimony would likely assist the trier of fact." (citations omitted)). Furthermore, the Plaintiff does not explain why being a corporate consultant makes someone unqualified to give statistical opinions. Given her background in statistics, the Court finds that McGrath is qualified.

Testimony [Doc. 131], at 4-18). The Court will exclude McGrath's testimony as unreliable.

The Plaintiff argues that McGrath's opinions are unreliable because the CPSC database that she uses to show carbon monoxide poisoning deaths have not increased does not differentiate between deaths from vehicles with keyless ignition and deaths from vehicles with mechanical ignition. (Pl.'s Br. in Supp. of Mot. to Exclude McGrath's Testimony, at 5-12). Accordingly, the Plaintiff argues that there is no reliable way to do a statistical analysis comparing the risk of death that each ignition type poses. (*Id.*). In response, the Defendants assert that the Plaintiff's arguments are inapposite because she "badly mischaracterize[s] Ms. McGrath's opinions." (Defs.' Br. in Opp'n to Mot. to Exclude McGrath's Testimony, [Doc. 139], at 4). They contend that McGrath is not attempting to compare the risks of carbon monoxide deaths with mechanical ignitions and keyless ignitions. (*Id.* at 6) ("The record could not be clearer - there is *zero* evidentiary support for Plaintiff's assertions that Ms. McGrath attempts to compare the rates of accidental carbon monoxide exposure deaths involving mechanical versus keyless ignition vehicles.").

Despite this argument, when the Defendants explain what McGrath *is* attempting to demonstrate, they show that the Plaintiff is not mischaracterizing the evidence. If not trying to show that keyless ignitions do not pose a greater risk of death than mechanical ignitions, how are McGrath's

opinions relevant? The Defendants say,

> If Plaintiff's design defect allegation was true - i.e., if keyless ignition systems without automatic engine shut-off were creating an unreasonable hazard of carbon monoxide exposure deaths - then one would expect that the overall rate of accidental deaths due to vehicles' engines left running in enclosed spaces (regardless of the vehicles' ignition type) would increase over the same period of time that keyless ignition vehicles have proliferated in the U.S. market. However, Ms. McGrath's analysis demonstrates there is no consistently increasing trend in such accidental deaths.

(Defs.' Br. in Opp'n to Mot. to Exclude McGrath's Testimony, at 9-10)

One would only expect the overall rate of accidental death to increase in that case if one is implicitly comparing the risk of death by keyless ignition and mechanical ignition. If one does not assume that the risk of death by mechanical ignition was less than the risk of death by keyless ignition, then McGrath's results would not be unexpected in the face of a keyless ignition defect. Put more concretely, if the rate of carbon monoxide poisoning deaths of the allegedly defective keyless ignition vehicles was at the same rate as mechanical ignition vehicles, then the introduction of the keyless ignition vehicles would not have led to an increase in the overall number of accidental deaths. Thus, the Defendants are wrong to say that McGrath's analysis does not depend on a comparison between keyless and mechanical ignitions.[5] The

---

[5] Alternatively, if these opinions truly are being proffered for non-comparative reasons, they are unhelpful and likely to mislead the jury. The mere fact that accidental carbon monoxide poisoning deaths have not increased

Defendants' argument that they are not comparing mechanical and keyless ignitions is unavailing.

Furthermore, the inference that the Defendants are attempting to make (i.e., that overall deaths would have increased from 2011-2021 as keyless ignitions became more popular if the Plaintiff's allegations were true) assumes that, in the absence of a defect, accidental carbon monoxide poisoning deaths would be constant over time. There are many possible reasons for why this might not be true. Information campaigns may have become increasingly successful at warning people about the risks of carbon monoxide poisoning. The rate at which people use carbon monoxide detectors may have increased over time. The number of people living in residences with garages may have decreased over time. Mechanical ignition vehicles may have added new safety features that effectively reduced the number of carbon monoxide poisoning

_____

to a statistically significant degree from 2011-2021 will not "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 401; 702(A). As described more fully below, simply because overall deaths have not increased does not mean that there is no defect or that the alleged defect did not cause the Plaintiff and decedent's injuries. The fact that keyless ignitions have become more popular since 2011 is similarly unhelpful (i.e., the fact that keyless ignitions have become more popular does not help the jury identify if there was a defect). When put together, this evidence would likely mislead the jury into making conclusions not warranted by the evidence. Given the fact that these conclusions are unhelpful, the prejudice caused by misleading the jury would substantially outweigh the minimal probative value of these opinions. Accordingly, even if somehow noncomparative, these opinions should still be excluded under Federal Rules of Evidence 403 and 702.

deaths for those vehicles over time. In any of these instances, the changes over time may have offset the increase in deaths caused by the alleged defect. That would net no overall increase in deaths despite the introduction of a new defect. Since nothing in McGrath's research accounts for such possibilities, her research does not reliably support the Defendants' unstated assumption that deaths would be constant in the absence of the defect.

The Defendants also point to the fact that Plaintiff's rebuttal expert, Mendel Singer, uses McGrath's analysis method. (Defs.' Br. in Opp'n to Mot. to Exclude McGrath's Testimony, at 7-9). There are several problems with this argument. First, the excerpt of the deposition that the Defendants provide does not include the question being asked or even the full answer given. The Court takes this opportunity to remind both parties that the Local Rules requires full deposition transcripts to be filed on the docket when an excerpt is referenced in a summary judgment motion. L.R. 56.1(C) ("[W]hen a portion of a deposition is referenced and submitted, then the party in custody of the original of that deposition shall cause the entire deposition to be filed with the Court."). This argument is a perfect example for why this rule exists. The Defendants conveniently omitted part of Singer's answer which states that the data does not permit him or McGrath to arrive at a "relevant and useful conclusion for this case." (Singer Dep., [Doc. 131-5], at 39:2-7). The Court is only able to see that statement because the Plaintiff included the next page in her excepts

13

provided (however, the Court still cannot see the question or beginning of his answer).   With what the Court has been provided, it appears that Singer was using McGrath's methodology only to say that her conclusion depended heavily on her choice of starting in 2011. If she chose to start at a later year, her method would show a statistically significant increase in deaths. He was clearly not endorsing or adopting her methodology.

At bottom, McGrath presents nothing more than a simple correlation analysis and does not include plausible alternative explanations. Her statistics cannot be reliably used to show the lack of a defect.[6] It is similarly unreliable using data that does not differentiate between ignition types to directly or indirectly compare the relative risks of each type of ignition. *Cf. Chavez v. Ill. State Police*, 251 F.3d 612, 643 (7th Cir. 2001) (rejecting as unreliable, for an equal protection claim, data purporting to show unlawful racial profiling because "[w]ithout comparative racial information, plaintiffs can not [sic] prove that they were stopped, detained, or searched, when similarly situated whites were not."). As stated above, the burden is on the proffering party to show that

_____

[6] Additionally, McGrath's method shows with 89.5% confidence that there *is* an increasing trend. (Singer Decl. ¶ 6). While that is slightly below the 95% statistical significance threshold, it is still much more consistent with an increasing trend than a flat or decreasing trend. Furthermore, simply starting her analysis in 2012 instead of 2011 does show a statistically significant trend. (*Id.*; Singer Dep. 38:2-6). This presents an independent concern of possibly cherry-picking data in order to arrive at a desired result (i.e., a finding of no trendline).

an expert will be reliable and helpful to the jury. *See Chapman*, 766 F.3d at 1304. Since the Defendants have failed to do so, the Court will exclude McGrath's testimony.[7]

## C. Nathan Dorris

Nathan Dorris is a human-factors engineer. (Dorris Expert Report, [Doc. 132-1], at 1-2). The Plaintiff seeks to exclude four categories of opinions that Dorris asserts: (1) that the Tacoma's warnings were sufficient, (2) that drivers lose focus while using their vehicles, (3) that the Plaintiff and decedent should have had carbon monoxide detectors in their home, and (4) that the Tacoma was not defective because it complied with regulatory and voluntary standards. (*See generally* Pl.'s Br. in Supp. of Mot. to Exclude Dorris's Testimony, [Doc. 132]). The Court will address each in turn.

### i. Inattentive Drivers

The Plaintiff seeks to exclude Dorris's opinions about how driver inattentiveness can cause people to leave their engines running and to not respond to alerts or other feedback. (Pl.'s Br. in Supp. of Mot. to Exclude Dorris's Testimony, at 3-6). In response, the Defendants argue that "Dr. Dorris' discussion of driver distraction is just one component of the opinions he expresses in this case and is background to his primary opinions specific to the

---

[7] Because the Court reaches this conclusion on reliability grounds, it does not address the Plaintiff's "parroting" argument.

2017 Toyota Tacoma's Smart Key System and the subject incident" (Defs.' Br. in Opp'n to Mot. to Exclude Dorris's Testimony, [Doc. 142], at 3).

The statements at issue include, "[d]rivers that are distracted or inattentive (for whatever reason) can inadvertently leave their vehicle's engine running, regardless of the type of ignition system employed" and that "[n]ot only can inattention result in execution errors and omitted actions, but it may cause individuals not to respond to alerts or other feedback." (Dorris Expert Report, at 9, 25). Dorris is not particularly clear about whether these statements (or other similar ones) are opinions or facts on which he relies for other opinions. The Defendants themselves seem unsure. They state that these statements are "background to his primary opinions" in this case, but they also defend his ability to provide these as opinions. (Defs.' Br. in Opp'n to Mot. to Exclude Dorris's Testimony, at 3).

To the extent that this is an opinion, the Court agrees with the Plaintiff. "An expert's testimony is not relevant and may be excluded if it is directed to an issue that is well within the common sense understanding of jurors and requires no expert testimony." *Thibodeaux v. Gulf Coast Tugs, Inc.*, 668 F. Supp. 3d 486, 492 (E.D. La. 2023) (quotation omitted); *see also Perry v. Cummings*, 2024 WL 3552954, at *1 (N.D. Ga. May 6, 2024) (excluding an expert's opinions because "a jury does not need to be told by an expert witness that a driver should look for traffic or not follow too closely and jurors do not

16

need an expert to tell them that by failing to stop and rear-ending the plaintiffs that Defendant Cummins was not observing the standard of care required by the driver of a motor vehicle on Georgia's public road.").[8] A jury does not need an expert to tell it that distracted individual can make mistakes. (*See* Dorris Dep., [Doc. 132-2], 108:24-109:3) ("Q: . . . I mean, most people are aware drivers make mistakes that can cause accidents. I don't think that would surprise anyone. Do you think? A: I'm not aware of any dispute about that in this case.").

To the extent that these statements are merely background facts that supports his "primary opinions," the Court does not understand the Plaintiff to be objecting to that. (Defs.' Br. in Opp'n to Mot. to Exclude Dorris's Testimony, at 3). Therefore, Dorris may not opine that a vehicle operator's inattentiveness may cause errors. However, if that fact properly supports a valid expert opinion that Dorris is providing, then he may rely on that fact.

### ii.    Sufficiency of the Warning

Dorris opines that the warning provided by Toyota are "reasonable and appropriate." (Dorris Expert Report, at 12-23). The Plaintiff asserts that that opinion is unhelpful because it does not offer any analysis outside of what the

---

[8] The Defendants' attempt to distinguish *Perry* is unavailing. They state that "[c]ompared to the expert in *Perry*, Dr. Dorris' testimony is based on a far more extensive dataset than simply a police accident report." (Defs.' Br. in Opp'n to Mot. to Exclude Dorris's Testimony, at 8). However, this responds to the reliability analysis in that case, but the relevant portion here is the Court's helpfulness analysis.

jury can do itself. (Pl.'s Br. in Supp. of Mot. to Exclude Dorris's Testimony, at 6-8). The Court agrees.

In *American Family Mutual Insurance Company v. Techtronic Industries North America, Inc.*, 2014 WL 2196416, at *3 (D. Kan. May 27, 2014) (citation omitted), the defendants "retained Dr. Nathan Dorris to testify that the warning systems associated with the Power Stroke are reasonable and adequate." The court there excluded Dorris's testimony because it would "not aid the jury in determining the facts and understanding the evidence in this case." *Id.* The court reasoned that the product's operator manual and on-product warnings "were written for consumers similar to individuals who will sit on the jury. Thus, the jurors will be fully capable to assess whether the . . . warnings are adequate, *i.e.* whether they reasonably convey to the average user a fair indication of the nature and extent of the danger," as required under Kansas law. *Id.*; *see also Calvit v. Proctor & Gamble Mfg. Co.*, 207 F. Supp. 2d 527, 529 (M.D. La. 2002) ("The adequacy of the warning is a factual issue which the jury can handle without expert help from either side.").

The Defendants attempt to distinguish *American Family Mutual Insurance* because it only involved written warnings while Dorris's analysis here is about "a system of written, tactile, audible, and visual warnings, alerts and cues." (Defs.' Br. in Opp'n to Mot. to Exclude Dorris's Testimony, at 7). However, regardless of whether the warnings were written or included other

modalities, the warnings were directed towards consumers. Under Georgia law, the duty to warn of nonobvious foreseeable dangers "may be breached by (1) failing to adequately communicate the warning *to the ultimate user* or (2) failing to provide an adequate warning of the product's potential risks." *Thornton v. E.I. Du Pont De Nemours & Co., Inc.*, 22 F. 3d 284, 289 (11th Cir. 1994) (emphasis added) (citations omitted); *see also id.* ("Whether a warning is legally sufficient depends upon the language used and the impression that such language is calculated to *make upon the mind of the average user of the product*." (emphasis added)(citations omitted)).

Like the Kansas law that applied in *American Family Mutual Insurance*, the adequacy inquiry here takes the perspective of the user of the product. Therefore, the jury is fully capable of determining whether the adequacy of the warning(s) at issue here without the help of an expert. [9] The Motion will be granted with respect to this issue.

### iii.    Carbon Monoxide Detectors

The Plaintiff asserts that "Dorris attempts to opine that Mr. and Mrs.

_____

[9] The Defendants also state that Dorris's testimony is helpful because it involves "the scenario of a driver exiting a parked vehicle with the engine left running." (Defs.' Br. in Opp'n to Mot. to Exclude Dorris's Testimony, at 7). However, this is the exact scenario in which the warning is supposed to alert consumers. Much like the addition of other types of warnings, the jury will be able to evaluate whether the Tacoma's warnings would have alerted them if they exited their vehicles with the engine running.

Griffin should have equipped their home with carbon monoxide detectors."
(Pl.'s Br. in Supp. of Mot. to Exclude Dorris's Testimony, at 8). The only
relevant statement on the page of Dorris's report that the Plaintiff references
states:

> In a publication dated 08/2020, the Georgia Department of Public
> Health explicitly discussed CO exposure can cause "sudden
> illness or death"; potential sources of CO exposure include
> automobile exhaust; *to install CO detectors "in every room used*
> *for sleeping"*; "DO NOT leave a motor vehicle running in an
> enclosed garage" (emphasis in original) (see Figure 1)

(Dorris Expert Report, at 10) (emphasis added). This statement is contained
under the section heading "Exhaust Fumes and CO Are Well Known Hazards."
(*Id.*). Other than the emphasized portion of the above quote, there is no other
reference to carbon monoxide detectors in that section or anywhere else in the
report.

The Court does not interpret this as Dorris opining that the Plaintiff and
decedent should have put carbon monoxide detectors in their home. Rather, he
is identifying one of the materials that he used to arrive at his conclusion that
"Exhaust Fumes and CO Are Well Known Hazards." The Plaintiffs make no
argument that Dorris is not qualified to reach that conclusion or that he
reached it in an unreliable or that that conclusion is unhelpful. The Court will
therefore deny the Motion with respect to this issue.

### iv.    Compliance with Relevant Standards

The Plaintiff seeks to preclude Dorris from testifying that the Tacoma

was not defective because it was compliant with regulatory minimum standards. (Pl.'s Br. in Supp. of Mot. to Exclude Dorris's Testimony, at 9-10). The Defendants respond that a jury is entitled to consider compliance with federal standards in determining whether a design was reasonable and that Dorris only considered compliance as one of several bases for concluding that the Tacoma was not defective. (Defs.' Br. in Opp'n to Mot. to Exclude Dorris's Testimony, at 10-12). The Court agrees with the Plaintiff.

"[E]xperts may not testify that a party was in compliance with a federal regulation. Whether someone has violated or is in compliance with the law is a legal conclusion." *Trinidad v. Moore*, 2017 WL 490350, at *3 (M.D. Ala. Feb. 6, 2017). In *Nicholson v. McCabe*, 2003 WL 25676474, at *1 (N.D. Ala. June 2, 2003), the plaintiff's expert sought to testify that the defendant had violated the Federal Motor Carrier Safety Regulations. The plaintiff argued the expert should be able to do so and correctly stated that the jury was allowed to consider violations of the Federal Motor Carrier Safety Regulations. *Id.* The court rejected that argument, explaining, "[w]hat plaintiffs miss is that the court also stated that the *judge* is the proper avenue for instructing the jury as to those regulations, not an expert witness." *Id.* (citation omitted). The court then excluded the testimony as an improper legal opinion. *Id.*

The same reasoning applies here. For example, Dorris denies that the lack of automatic engine shutoff rendered the Tacoma defective in part because

"[a]t the time the subject vehicle was manufactured and sold (and even today), such a feature is not required by any regulation or voluntary standard." (Dorris Expert Report, at 28). In other words, Dorris is stating that the Tacoma complied with federal regulations. That warrants exclusion. Like in *Nicholson*, it does not matter that the jury can consider evidence of the Tacoma's compliance with federal regulation. Nor does the fact that Dorris makes other non-legal conclusions save the testimony that does. The Court will preclude Dorris from opining that the Tacoma was in compliance with federal regulation.

**D. Harry Pearce II**

Harry Pearce II is a principal engineer who has a Master of Science in Mechanical Engineering. (Pearce Expert Report, [Doc. 133-1], at 6). The Plaintiff seeks to exclude four of his opinions from testimony: (1) opinions going to intent, motive, or state of mind, (2) opinions about the source of the carbon monoxide, (3) opinions about the efficacy of carbon monoxide detectors would have had in this case, (4) opinions "parroting" Jeya Padmanaban. (*See generally* Pl.'s Br. in Supp. of Mot. to Exclude Pearce's Testimony, [Doc. 133]).

**i.    Intent, Motive, and State of Mind**

First, the Plaintiff asserts that Pearce should be excluded from testifying about Toyota's subjective state of mind. (Pl.'s Br. in Supp. of Mot. to Exclude Pearce's Testimony, at 2-6). The Defendants reply that, "Mr. Pearce

22

should be permitted to testify about the technical information and engineering considerations detailed in Toyota's documents and in TMC's engineers' testimony, as well as comment on NHTSA's statements about automatic engine shut-off, so that the jury may fully understand and evaluate the bases of his opinions." (Defs.' Br. in Opp'n to Mot. to Exclude Pearce's Testimony, [Doc. 140], at 8). The parties are talking past each other.

The Plaintiff is correct that, "[e]xpert testimony about a party's intent, motive, or state of mind is inadmissible." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2023 WL 3517923, at *3 (D.S.C. May 2, 2023) (citation omitted); *see also In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 479 (S.D.N.Y. 2016) (noting that "[t]o the extent Plaintiffs want the jury to draw inferences about intent or motive from Defendants' statements, that is a matter for argument," rather than expert testimony). "That said, the experts' opinions that merely concern what information was available and possessed by the Defendants are admissible." *In re Takata Airbag Prod. Liab. Litig.*, 2022 WL 18956175, at *4 (S.D. Fla. Dec. 28, 2022); *see also Buckner v. Boston Sci. Corp.*, 2023 WL 4139377, at *5 (M.D. Ga. June 22, 2023) ("Nothing in this ruling shall prohibit Dr. Rosenzweig from testifying about Boston Scientific's internal documents to the extent that they explain a basis for his opinions."). Altogether, "[w]hile . . . experts may testify as to whether information contained in Defendants' internal documents indicated certain risks to users .

23

. . they may not opine as to what Defendants 'knew,' what they intended, or what their motives were." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019, at *42 (N.D. Fla. Feb. 28, 2021) (citation omitted).

Therefore, the Plaintiff is correct that Pearce cannot make statements about the Defendants' state of mind, such as "Toyota did not want to [install auto shutoff] because of the concern of introducing a new risk of hot car deaths." (Pearce Dep., [Doc. 133-1], at 71:17-19). On the other hand, the Defendants are correct that Pearce may use the Defendants' internal documents and the Defendants' employees' testimonies to form his opinions and "may testify as to whether information contained in Defendants' internal documents indicated certain risks." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019, at *42 (citation omitted).

### ii.    Source of Carbon Monoxide

The Plaintiff seeks to exclude any opinion about the source of the carbon monoxide that caused her and the decedent's injuries. (Pl.'s Br. in Supp. of Mot. to Exclude Pearce's Testimony, at 6-7). When Pearce was asked whether he had an opinion about the source of the carbon monoxide that caused the injuries in this case, he answered, "I was not asked to do that so I do not have an opinion on that." (Pearce Dep., [Doc. 133-1], at 62:12-16). He went on to state possible options, such as the Tacoma or gas leaks. (*Id.* at 62:16-18). The lawyer then follows up by asking whether he personally attempted to

determine the source of the carbon monoxide, Pearce responds, "I have not, and I was not asked to do that." (*Id.* at 62:22-24). The Plaintiff contends that Pearce should be prevented from stating opinions about the source of the carbon monoxide, as they would be irrelevant, unreliable, and unhelpful. (Pl.'s Br. in Supp. of Mot. to Exclude Pearce's Testimony, at 6-7).

The Defendants respond by arguing that this part of the Motion is moot since Pearce does not intend to offer this testimony. (Defs.' Br. in Opp'n to Mot. to Exclude Pearce's Testimony, at 9). The Defendants then add a caveat. They state that Pearce will not state an opinion on this matter, "unless Plaintiff opens the door to this subject through her attorneys' examination of Mr. Pearce or the testimony of other witnesses she presents at trial." (*Id.*).

However, as the Defendants surely know, the Plaintiff has retained an expert who will testify as to the source of the carbon monoxide. (Reply Br. in Supp. of Mot. to Exclude Pearce's Testimony, at 6; Damm Expert Report, [Doc. 149-27], at 27). Moreover, causation is a necessary element for the Plaintiff's substantive claims. There is therefore little doubt that the Plaintiff will "open the door" to the issue of the carbon monoxide's source. That will not permit Defendants to ask Pearce questions about the subject when he expressly stated that he has no opinion. *See Persian Gulf Inc. v. BP West Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1171 (compiling cases excluding expert opinions if the expert denied holding that opinion). If the Defendants wanted to put on

testimony disputing the Plaintiff's expert's opinions about the source of the carbon monoxide, they should have retained a rebuttal expert. The Motion to Exclude will be granted with respect to this issue.

### iii.    Carbon Monoxide Detectors

Pearce intends to opine that, "[w]ith multiple sources of CO in a home, the best protection from CO exposure is the installation of CO detectors in the home. Auto engine shut-off only protects from the one vehicle on which it is installed." (Pearce Expert Report, at 15). The Plaintiff objects to this because it depends on two assumptions: (1) that any carbon monoxide detectors in the house would have worked and (2) that the Plaintiff and the decedent would have responded to the carbon monoxide detector if it did work. (Pl.'s Br. in Supp. of Mot. to Exclude Pearce's Testimony, at 8-9).

However, Pearce has extensive experience from which he could derive his opinion. *See* (Pearce Curriculum Vitae, [Doc. 140-5]; Pearce Decl., [Doc. 140-1]). To the extent that the Plaintiff disputes that this general opinion applies to the specific facts of this case, she may cross examine the witness on the subject. *See Hightower v. Goldberg*, 2018 WL 296955, at *2 (M.D. Ga. Jan. 4, 2018) ("Defendants' objections go to the weight and credibility of Mr. Beauchamp's opinions, not their reliability. If Mr. Beauchamp failed to consider certain facts in forming his opinions, Defendants will be able to vigorously cross examine him, present their own expert testimony, and tell the

jury why they believe his opinion should not be believed."). The Court will deny the Plaintiff's Motion as to this issue.

### iv.    Parroting

The Plaintiff argues that testimony by Pearce about a 2015 paper published by Jeya Padmanaban would be irrelevant and would constitute inadmissible "parroting." (Pl.'s Br. in Supp. of Mot. to Exclude Pearce's Testimony, at 9-10). In their Response, the Defendants clarify that they do not intend to ask Pearce about Padmanaban's research. (Defs.' Br. in Opp'n to Mot. to Exclude Pearce's Testimony, at 11). Instead, Pearce included that study as general background. (*Id.* at 11-12). Accordingly, the Defendants will not bring up the Padmanaban study unless the Plaintiff opens the door to that testimony. (*Id.* at 12). In light of this clarification, the Court will deny this part of the Plaintiff's Motion to Exclude. If the Plaintiff asks about the Padmanaban study, then the Defendants will have the right to ask about it too.

### IV.    Conclusion

For the foregoing reasons, the Plaintiff's Motion to Exclude Randall Tackett's Testimony [Doc. 130] is GRANTED, the Plaintiff's Motion to Exclude Angela McGrath's Testimony [Doc. 131] is GRANTED, the Plaintiff's Motion to Exclude Nathan Dorris's Testimony [Doc. 132] is GRANTED in part and DENIED in part, and the Plaintiff's Motion to Exclude Harry Pearce's Testimony [Doc. 133] is GRANTED in part and DENIED in part.

SO ORDERED, this ___18th___ day of June, 2025.

THOMAS W. THRASH, JR.
United States District Judge